# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 17, 2014         Decided May 30, 2014

No. 13-1035

NATIONAL ENVIRONMENTAL DEVELOPMENT ASSOCIATION'S
CLEAN AIR PROJECT,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

———

On Petition for Review of Action of the
United States Environmental Protection Agency

———

*Gregory G. Garre* argued the cause for petitioner. On the briefs was *Leslie Sue Ritts*.

*Kim Smaczniak*, Attorney, Environmental Defense Section, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Robert G. Dreher*, Acting Assistant Attorney General, Environment and Natural Resources Division and *Michael Horowitz*, Attorney, U.S. Environmental Protection Agency.

Before: TATEL, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Under Title V of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7661-7700, every "major source" of pollution is required to obtain an operating permit for a fixed term. *Id*. § 7661a(a). Title V operating permits impose emission limitations, standards, monitoring requirements, compliance schedules, and other conditions on covered sources of pollution. *See id.* § 7661c. A source is considered "major" if it emits a certain amount of pollution. *Id.* § 7602(j). The Act also requires New Source Review (NSR) permits for a new or modified major source within an area not in attainment with National Ambient Air Quality Standards, if the source emits a certain amount of pollutants. *Id.* §§ 7502(c)(5), 7503. Under regulations promulgated by the Environmental Protection Agency ("EPA"), multiple pollutant-emitting activities are considered to be a single stationary source if they are, *inter alia*, "adjacent." 40 C.F.R. § 71.2, § 52.21(b)(5)-(6).

In applying agency regulations, EPA has stated that determinations as to whether two or more facilities are "adjacent" should be based on the functional interrelationships of the facilities, and not simply the physical distance between the facilities. In *Summit Petroleum Corp. v. EPA*, 690 F.3d 733 (6th Cir. 2012), however, the Sixth Circuit reversed an EPA determination that a natural gas plant and associated wells were one "source" for the purpose of Title V permitting. The court held that "EPA's determination that the physical requirement of adjacency can be established through mere functional relatedness is unreasonable and contrary to the plain meaning of the term 'adjacent.'" *Id*. at 735. It therefore found arbitrary and capricious EPA's decision to

treat the company's operations as one source subject to Title V permitting. *Id.* at 740-41.

In December 2012, two months after EPA's petition for rehearing was denied in *Summit Petroleum*, the Director of EPA's Office of Air Quality and Standards wrote a directive to the Regional Air Directors of each of the ten EPA regions "to explain the applicability of the decision by the [Sixth] Circuit Court of Appeals." *Applicability of the Summit Decision to EPA Title V and NSR Source Determinations* (Dec. 21, 2012), *reprinted in* Joint Appendix ("J.A.") 1-2 ("*Summit* Directive"). The *Summit* Directive states that "EPA may no longer consider interrelatedness in determining adjacency when making source determination decisions in its title V or NSR permitting decisions in areas under the jurisdiction of the [Sixth] Circuit." *Id.* at 1, *reprinted in* J.A. 1. The *Summit* Directive further states that:

> Outside the [Sixth] Circuit, at this time, the EPA does not intend to change its longstanding practice of considering interrelatedness in the EPA permitting actions in other jurisdictions. In permitting actions occurring outside of the [Sixth] Circuit, the EPA will continue to make source determinations on a case-by-case basis using the three factor test in the NSR and title V regulations at 40 CFR 52.21(b)(6) . . . .

*Id.* This case involves a challenge to the *Summit* Directive.

Petitioner – an association of resource extraction and manufacturing companies subject to permitting requirements under the CAA – claims that the *Summit* Directive injures its members who are located outside the Sixth Circuit. According to Petitioner, facilities outside the Sixth Circuit are now at a competitive disadvantage. Petitioner contends that by

establishing inconsistent permit criteria applicable to different parts of the country, the *Summit* Directive violates the CAA and EPA regulations.

EPA argues that the petition for review should be dismissed for three threshold reasons: (1) Petitioner lacks Article III standing because the alleged injury is entirely speculative. (2) The *Summit* Directive is not subject to judicial review because it is not a final agency action. (3) Petitioner's claim is not ripe for review because it does not raise a concrete issue that is fit for judicial review. And on the merits, EPA maintains that neither the CAA nor EPA regulations require it to ensure national uniformity in response to a judicial decision.

We hereby grant the petition for review and vacate the *Summit* Directive. We find no merit in EPA's arguments in opposition to Petitioner's claims. The *Summit* Directive creates a standard that gives facilities located in the Sixth Circuit a competitive advantage. It therefore causes competitive injury to Petitioner's members located outside of the Sixth Circuit. The Directive is a final agency action because it sets forth EPA's binding and enforceable policy regarding permit determinations. And Petitioner's claim is ripe for review because it presents a purely legal issue that will not benefit from further factual development.

On the merits, we hold that the *Summit* Directive is plainly contrary to EPA's own regulations, which require EPA to maintain national uniformity in measures implementing the CAA, and to "identify[] and correct[]" regional inconsistencies by "standardizing criteria, procedures, and policies." 40 C.F.R. § 56.3(a), (b). We need not decide whether the *Summit* Directive also contravenes the requirements of the CAA.

## I. BACKGROUND

Pursuant to the agency's authority under the CAA, 42 U.S.C. § 7601, EPA regulations entitled "Regional Consistency" provide that:

> It is EPA's policy to:
>
> (a) Assure fair and uniform application by all Regional Offices of the criteria, procedures, and policies employed in implementing and enforcing the act; [and]
>
> (b) Provide mechanisms for identifying and correcting inconsistencies by standardizing criteria, procedures, and policies being employed by Regional Office employees in implementing and enforcing the act . . . .

40 C.F.R. § 56.3(a), (b). The agency's "Regional Consistency" regulations specifically apply to "EPA employees in Headquarters to the extent that they are responsible for developing the procedures to be employed or policies to be followed by Regional Offices in implementing and enforcing the act." *Id.* § 56.2(b). In addition, "[a] responsible official in a Regional Office shall seek concurrence from the appropriate EPA Headquarters office on any interpretation of the Act, or rule, regulation, or program directive when such interpretation may result in inconsistent application among the Regional Offices of the act or rule, regulation, or program directive." *Id.* § 56.5(b).

As noted above, the CAA requires any "major source" of air pollution to obtain an operating permit. A "major" source

is "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C § 7602(j). In determining whether a facility emits pollutants at a level to qualify as a "major" source, EPA aggregates emissions from multiple facilities that are (1) under common control, (2) belong to the same major industrial grouping, and (3) "are located on one or more contiguous or adjacent properties." 40 C.F.R. § 71.2, 52.21(b)(5)-(6). Under the third requirement, EPA has long followed a general policy of "determin[ing] whether two facilities are 'adjacent' based on a 'common sense' notion of a source and the functional interrelationship of the facilities, rather than simply on the physical distance between the facilities." *Summit Petroleum*, 690 F.3d at 739 (quotations omitted).

In *Summit Petroleum*, petitioners challenged the aggregation of emissions from multiple facilities that EPA deemed "truly interrelated," even though the facilities were not located on contiguous, bordering properties. *Id.* at 741. The Sixth Circuit held that EPA's policy of considering functionally interrelated facilities "adjacent" when the facilities do not share a physical border violates the plain meaning of the word "adjacent." *Id.* at 744. In response to the *Summit Petroleum* decision, the Director of EPA's Office of Air Quality Control Standards issued the *Summit* Directive explaining that EPA would no longer apply the functionally interrelated standard to facilities located in areas within the jurisdiction of the Sixth Circuit. *Summit* Directive, *reprinted in* J.A. 1. However, "[i]n permitting actions occurring outside of the [Sixth] Circuit, the EPA will continue to make source determinations on a case-by-case basis using the three factor test in the NSR and title V regulations at 40 CFR 52.21(b)(6)." *Id.* Petitioner claims that the *Summit* Directive violates EPA's "Regional Consistency" regulations, which

say that "[i]t is EPA's policy to . . . [a]ssure fair and uniform application by all Regional Offices of the criteria, procedures, and policies employed in implementing and enforcing the act." 40 C.F.R. § 56.3(a).

## II.   ANALYSIS

### A.  Threshold Issues

#### 1.  *Standing*

The first issue before the court is Petitioner's standing. If Petitioner lacks standing, as EPA contends, then this court lacks jurisdiction to address the petition for review.

As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992):

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id*. at 560–61 (quotations and citations omitted). An association has standing to bring suit on behalf of its members if at least one member would have standing to sue in its own

right, the interests the association seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires that an individual member of the association participate in the law suit. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

EPA argues that Petitioner lacks standing because the harm that it alleges is conjectural and hypothetical, not imminent. EPA also argues that Petitioner has not suffered any harm caused by the *Summit* Directive, so there is no injury that can be redressed by a favorable decision from this court. These arguments fail.

Petitioner's members include companies in the oil and gas industry, as well as others in manufacturing sectors that operate facilities regulated under the Act. A number of these members operate facilities outside of the jurisdiction of the Sixth Circuit and, therefore, they remain subject to EPA's functionally interrelated permitting standard. The *Summit* Directive thus puts these companies at a competitive disadvantage vis-à-vis companies operating facilities located within the Sixth Circuit.

EPA contends that these alleged injuries are speculative because whether any particular facility qualifies as a "major" source depends on a number of factors, evaluated on a case-by-case basis. EPA's argument is shortsighted. Even if functional interrelatedness is not dispositive in a particular permit decision, the potential that certain facilities outside the Sixth Circuit *may* be considered "major" sources based on functional interrelatedness imposes an additional regulatory burden on these facilities because they must undergo EPA's case-specific assessment of whether they are functionally interrelated. Similar facilities within the Sixth Circuit will not be so burdened because emissions from these facilities will

not be aggregated unless they are physically adjacent. *See* Br. for Pet'r at 20 ("[U]nder this divergent regulatory scheme, companies with shale gas leases outside of the Sixth Circuit are placed at significant competitive disadvantage because they face additional permitting requirements and the ambiguity and delay that comes along with the 'case-by-case' determinations called for by the *Summit* Directive."); Reply Br. for Pet'r at 9 ("[M]embers operating outside the Sixth Circuit have to wait longer and pay more to do the same thing that, by virtue of the *Summit* Directive, their competitors within the Sixth Circuit can now do immediately. That concrete competitive injury is sufficient to give this suit the real-world basis that Article III demands.").

EPA also contends that the *Summit* Directive did not cause Petitioner's alleged injury and, therefore, the alleged injury will not be redressed by vacating the *Summit* Directive. Br. for Resp't at 21-22. EPA argues that the Directive could not have caused injury because it did not change the regulatory burdens imposed on sources outside of the Sixth Circuit. Thus, according to EPA, Petitioner's members with operations outside the Sixth Circuit "face . . . nothing more than the status quo they faced prior to the memorandum." *Id*. at 21. This argument fails because it ignores the reality that, even though the regulatory burdens remain unchanged outside the Sixth Circuit, the *Summit* Directive will increase the *relative* regulatory obligations and costs for companies outside the Sixth Circuit.

EPA's action has caused injury because the *Summit* Directive has binding legal effect. The consequences of the agency's action must, for causation purposes, be assessed not by reference to the status quo ante but instead to other actions EPA could have taken. Petitioner need not show that the *Summit* Directive rendered them worse off than the status quo

ante. They may alternatively show that, had the EPA taken the course of action that they claim the law required, they would have been better off. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 663 F.3d 470, 475 (D.C. Cir. 2011) (noting that, in standing analysis, "the historical baseline is not the only possible measure of injury"). As we explain below, EPA could have responded to the *Summit Petroleum* decision in several ways that would have avoided affording a competitive advantage to sources within the Sixth Circuit. Therefore, vacating the *Summit* Directive could redress Petitioner's injury because it will remove the binding legal rule that subjects its members to unequal treatment.

## 2. *Final Agency Action*

The CAA provides for judicial review of "final action taken" by EPA. 42 U.S.C. § 7607(b)(1). EPA argues that the *Summit* Directive does not reflect a final agency action and, therefore, it is not subject to review. We disagree.

In order to be "final," an agency action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted); *NRDC v. EPA*, 643 F.3d 311, 319 (D.C. Cir. 2011) (final agency action "announces a binding change in the law"). EPA contends that the *Summit* Directive is not the consummation of its decisionmaking process because, by its terms, the directive explains that EPA is still "assessing what additional actions may be necessary," and "EPA's deliberations surrounding the matter are ongoing." Br. for Resp't at 23. We find no merit in these arguments.

An agency action may be final even if the agency's position is "subject to change" in the future. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[A]ll laws are subject to change . . . [t]he fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." (citation omitted)); *see also Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012) ("The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal."). This is hardly surprising because many agency actions are subject to reconsideration. If an agency action announces a binding change in its enforcement policy which immediately affects the rights and obligations of regulated parties, then the action is likely final and subject to review. *See* EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 137-141 (2d ed. 2013).

The *Summit* Directive is not merely a policy statement or an interpretative rule that is unreviewable because it "does not establish a binding norm and is not finally determinative of the issues or rights to which it is addressed." *Id*. at 157. The record establishes that the *Summit* Directive provides firm guidance to enforcement officials about how to handle permitting decisions. It therefore clearly "reflect[s] a settled agency position which has legal consequences for [regional officials] administering their permit programs and for companies . . . who must obtain Title V permits." *Appalachian Power Co.*, 208 F.3d at 1023. Indeed, the finality and legal consequences of the *Summit* Directive were made plain when the EPA relied on the directive in a permit decision involving a company located outside the jurisdiction of the Sixth Circuit. *Approval and Promulgation of Federal Implementation Plan for Oil and Natural Gas Well Production Facilities; Fort Berthold Indian Reservation (Mandan, Hidatsa, and Arikara Nation), North Dakota*, 78

Fed. Reg. 17836, 17842 & n.10 (March 22, 2013). EPA explained that the Sixth Circuit's version of the adjacency test did not apply to facilities in North Dakota because they were outside of the jurisdiction of the Sixth Circuit. *Id*. And EPA cited the *Summit* Directive to support its action. *Id*.

EPA also cites *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004), in support of its claim that the *Summit* Directive is not reviewable because it simply restates the agency's longstanding interpretation of its regulations. Br. for Resp. at 24. The holding of *Independent Equipment Dealers*, however, gives no aid to EPA's position here. In *Independent Equipment Dealers*, the court ruled that a letter written by an EPA official was unreviewable because it was "purely informational." 372 F.3d at 427. The letter "neither announced a new interpretation of the regulations nor effected a change in the regulations themselves." *Id.* Importantly, the letter compelled no one to do anything and had "no binding effect whatsoever" on agency officials or on regulated parties. *Id*. The *Summit* Directive plainly differs from the letter at issue in *Independent Equipment Dealers* because it *compels* agency officials to apply different permitting standards in different regions of the country.

EPA has undisputed legal authority to prescribe rules to determine whether a facility constitutes a "major" source under the CAA. And EPA has uncontested authority to adopt and enforce policies regarding how the various regional offices of the agency must implement and enforce the statute and its accompanying rules. The *Summit* Directive addresses both matters and announces a new enforcement regime in response to the Sixth Circuit's decision. In this light, there can be little doubt here that the *Summit* Directive reflects final agency action that is subject to judicial review.

### *3.* *Ripeness*

"Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review. The ripeness inquiry springs from the Article III case or controversy requirement that prohibits courts from issuing advisory opinions on speculative claims. In other words, if a claim challenging final agency action is not concrete, it may be unfit for judicial review without regard to whether the complaining party has standing to pursue the claim." EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 141 (2d ed. 2013) (citing *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967); *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974)). "In determining the fitness of an issue for judicial review we look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (quotations omitted).

EPA argues that this case is not ripe for review because "it is entirely speculative how EPA's interpretation . . . will impact any source, or category of sources, in particular." Br. for Resp. at 27. Therefore, according to EPA, "we need to wait for the action to be applied to see what its effect will be." *Id.* (quotations and alterations omitted). EPA contends that, in some cases, treating functionally interrelated facilities as a single source may subject those facilities to the "major" source permit requirement, while in others it may not, depending on other factors that are considered on a case-by-case basis. *Id.* at 27-28. EPA also points out that, in some cases, treating a group of facilities as a single source may result in greater regulatory flexibility, as opposed to additional regulatory requirements. *Id.* at 27. EPA's argument

misses the point. Petitioner's challenge in this case presents a purely legal question of whether EPA's final action adopting a non-uniform enforcement regime violates the strictures of the CAA or EPA regulations. It is unnecessary to wait for the *Summit* Directive to be applied in order to determine its legality.

## B. Merits

### 1. Standard of Review

"Judicial review of an agency's interpretation of its own regulations is governed by 5 U.S.C. § 706(2)(A), which requires courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 199 (2d ed. 2013) (citing *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). And it is undisputed that the arbitrary and capricious standard of review applies to EPA actions taken under the Clean Air Act. *See, e.g., Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-97 (2004) (applying the "default standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)" to a petition for review under the Clean Air Act).

> Pursuant to this standard, a court accords "substantial deference" to an agency's views. . . . Thus, an agency interpretation [of its own regulations] that "does not violate the Constitution or a federal statute . . . must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993). "In other words," deference to an agency's interpretation of its regulation is

required "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512.

EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 199 (2d ed. 2013).

It is "axiomatic," however, "that an agency is bound by its own regulations." *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979) (holding that an agency does not have authority to "play fast and loose with its own regulations"). "Although it is within the power of [an] agency to amend or repeal its own regulations, [an] agency is not free to ignore or violate its regulations while they remain in effect." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978). Thus, an agency action may be set aside as arbitrary and capricious if the agency fails to "comply with its own regulations." *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011).

### 2. The Summit Directive

The essence of Petitioner's argument is that the *Summit* Directive must be vacated because it violates EPA's "Regional Consistency" regulations without purporting to amend those regulations. We agree.

As noted above, the applicable regulations state in clear terms that it is EPA's regulatory policy to "*assure* fair and uniform application by all Regional Offices of the criteria, procedures, and policies employed in implementing and enforcing the act" and to "[p]rovide mechanisms for identifying and correcting inconsistencies by standardizing criteria, procedures, and policies being employed by Regional

Office employees in implementing and enforcing the act." 40 C.F.R. § 56.3(a), (b) (emphasis added). The regulations also provide that officials in the regional offices "shall *assure* that actions taken under the act . . . [a]re as consistent as reasonably possible with the activities of other Regional Offices." *Id.* § 56.5(a)(2) (emphasis added). And they specifically apply to officials in EPA headquarters who are responsible for developing the policies governing the implementation and enforcement of the CAA. *Id.* § 56.2.

EPA argues that these regulations "targeted particular aspects of the Act that presented consistency problems" but do not "require that EPA officials maintain perfect uniformity in the application of criteria, procedure and policies in implementing and enforcing the Act." Br. for Resp't at 35. In support of this reading, EPA points out that section 56.4 requires the Administrator to ensure uniform enforcement of Parts 51 and 58, which pertain to state implementation plans and air quality monitoring programs not at issue in this case. *Id.* Thus, according to EPA, because the *Summit* Directive did not violate these "specific regulatory obligations," *id.* at 36, the directive cannot be said to violate agency regulations. EPA's argument attempts to prove too much.

It is true that section 56.4 states that "[t]he Administrator shall include, as necessary, with any rule or regulation proposed or promulgated under Parts 51 and 58 of this chapter mechanisms to assure that the rule or regulation is implemented and enforced fairly and uniformly by the Regional Offices." 40 C.F.R. § 56.4(a). But the references to "Parts 51 and 58" in section 56.4 in no way dilute the broader "Regulatory Consistency" mandates found in sections 56.1, 56.2, 56.3, and 56.5, which are not limited to Parts 51 and 58. Section 56.5, for example, states without limitation that EPA's regional officials will "assure that actions taken under

the act . . . [are] carried out fairly and in a manner that is consistent with the Act and Agency policy as set forth in the Agency rules and program directives," and that these actions "[a]re as consistent as reasonably possible with the activities of other Regional Offices." *Id.* § 56.5(a)(1), (2). The regulations also state that "[a] responsible official in a Regional Office shall seek concurrence from the appropriate EPA Headquarters office on any interpretation of the Act, or rule, regulation, or program directive when such interpretation may result in inconsistent application among the Regional Offices of the act or rule, regulation, or program directive." *Id*. § 56.5(b). These regulations, taken together, strongly articulate EPA's firm commitment to national uniformity in the application of its permitting rules. And there is no indication that EPA intended to exempt variance created by a judicial decision.

EPA responds that the "general policy statements in Part 56" should not be read "as mandating that EPA adopt the interpretation of the circuit court that first addresses a legal matter." Br. for Resp't at 36. "It is absurd," according to EPA, "to suggest that EPA would have used a general policy statement to constrain as important an agency function as its discretion to independently assess the dictates of the statutes and regulations it is charged with administering." *Id*. (citations and quotations omitted). EPA's overblown characterization of Petitioner's position is misguided.

Any problems that EPA now faces as a result of Petitioner's action are attributable to the agency's decision to issue a directive that is plainly contrary to the agency's own "Regional Consistency" rules. EPA seems to assume that under Petitioner's position, the agency would be limited to one course of action – follow the *Summit Petroleum* decision in all regions of the country. But there are several other

alternatives that might be available to EPA that would not violate its uniformity regulations.

First, EPA might be able to revise its regulations for aggregating emissions from multiple facilities, so as to require aggregation when facilities are functionally interrelated, rather than "adjacent." Second, EPA could have appealed the Sixth Circuit decision in *Summit Petroleum* to the Supreme Court, which it did not do. *See Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1092 (D.C. Cir. 1992) ("When an agency honestly believes a circuit court has misinterpreted the law, there are two places it can go to correct the error: Congress or the Supreme Court."). And, finally, EPA might also revise its uniformity regulations to account for regional variances created by a judicial decision or circuit splits.

EPA contends that, because the Act allows review of EPA's regional actions by different circuits, 42 U.S.C. § 7607(b)(1), the CAA contemplates divergence between circuits and, thus, permits the agency to apply varied standards in different circuits. In support of the claim that the Act and its regulations allow regional variance resulting from decisions in different circuits, EPA invokes the doctrine of intercircuit nonaquiescence. Br. for Resp't at 30-31, 36 (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1261 (D.C. Cir. 1996) (Rogers, J., dissenting) ("[A]fter one circuit has disagreed with its position, an agency is entitled to maintain its independent assessment of the dictates of the statutes and regulations it is charged with administering, in the hope that other circuits, the Supreme Court, or Congress will ultimately uphold the agency's position.")); *see also Am. Tel. & Tel. Co. v. FCC,* 978 F.2d 727, 737 (D.C. Cir. 1992) (referring to agency's "right to refuse to acquiesce" in decisions of circuit courts). EPA contends that "[t]o compel an agency to follow the adverse ruling of a particular court of

appeals would be to give that court undue influence in the intercircuit dialogue by diminishing the opportunity for other courts of proper venue to consider, and possibly sustain, the agency's position." Br. for Resp't at 31 (quoting Samuel Estreicher and Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies,* 98 YALE L.J. 679, 764 (1989)).

We need not determine whether the CAA allows EPA to adopt different standards in different circuits. Since EPA's regulations preclude the *Summit* Directive by requiring uniformity, there is no need for us to address whether the Act does.

The doctrine of intercircuit nonaquiescence does not allow EPA to ignore the plain language of its own regulations. As noted above, "[an] agency is not free to ignore or violate its regulations while they remain in effect." *U.S. Lines, Inc.*, 584 F.2d at 526 n.20. Therefore, an agency may not refuse to acquiesce if doing so violates its own regulations. Section 56.3 not only states that EPA will establish uniform criteria for implementing the Act, but also identify and correct inconsistencies in such criteria. 40 C.F.R. § 56.3(b). This implies that EPA was obligated to respond to the *Summit Petroleum* decision in a manner that eliminated regional inconsistency, not preserved it. EPA's current regulations preclude EPA's inter-circuit nonaquiescence in this instance, and the *Summit* Directive is therefore contrary to law.

## III.  CONCLUSION

For the reasons set forth above, we grant the petition for review and vacate the *Summit* Directive.