# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued September 6, 2019　　　Decided October 25, 2019

No. 18-1114

STATE OF CALIFORNIA, BY AND THROUGH ITS GOVERNOR
EDMUND G. BROWN JR., ATTORNEY GENERAL XAVIER
BECERRA AND CALIFORNIA AIR RESOURCES BOARD, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND ANDREW
WHEELER, AS ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

ALLIANCE OF AUTOMOBILE MANUFACTURERS AND
ASSOCIATION OF GLOBAL AUTOMAKERS, INC.,
INTERVENORS

―――――

Consolidated with 18-1118, 18-1139, 18-1162

―――――

On Petitions for Review of an Action
of the United States Environmental Protection Agency

―――――

*David Zaft*, Deputy Attorney General, Office of the Attorney General for the State of California, argued the cause for State Petitioners. With him on the briefs were *Xavier Becerra*, Attorney General, *Robert W. Byrne*, Senior Assistant Attorney General, *Gary E. Tavetian* and *David A. Zonana*, Supervising Deputy Attorneys General, *Julia K. Forgie*, Deputy Attorney General, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Matthew I. Levine* and *Scott N. Koschwitz*, Assistant Attorneys General, *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Thomas J. Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *Jacob Larson*, Assistant Attorney General, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Valerie Edge*, Deputy Attorney General, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Daniel I. Rottenberg*, Assistant Attorney General, *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Steven M. Sullivan*, Solicitor General, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Mary M. Sauer* and *Laura E. Jensen*, Assistant Attorneys General, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Max Kieley*, Assistant Attorney General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Christophe Courchesne*, *Carol Iancu* and *Matthew Ireland*, Assistant Attorneys General, *Megan M. Herzog*, Special Assistant Attorney General, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Yueh-Ru Chu*, Chief, Affirmative Litigation Section, Environmental Protection Bureau, *Gavin G. McCabe*, Special Assistant Attorney General, *Gurbir S. Grewal*, Attorney General, Office of the Attorney General for the State of New

Jersey, *David C. Apy*, Assistant Attorney General, *Robert J. Kinney*, Deputy Attorney General, *Josh Shapiro*, Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Michael J. Fischer*, Chief Deputy Attorney General, *Kristen M. Furlan*, Assistant Director, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Paul Garrahan*, Attorney-in-Charge, *Thomas J. Donovan, Jr.*, Attorney General, Office of the Attorney General for the State of Vermont, *Nicholas F. Persampieri*, Assistant Attorney General, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Gregory S. Schultz*, Special Assistant Attorney General, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Katharine G. Shirey*, Assistant Attorney General, *Mark R. Herring*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, *Paul Kugelman, Jr.*, Senior Assistant Attorney General and Chief, *Matthew R. McGuire*, Principal Deputy Solicitor General, and *Matthew L. Gooch*, Assistant Attorney General. *Aaron Goldstein*, Deputy Attorney General, Office of the Attorney General for the State of Delaware, *Emily C. Nelson*, Assistant Attorney General, Office of the Attorney General for the State of Washington, *Stacey W. Person*, Assistant Attorney General, and *Peter Surdo*, Special Assistant Attorney General, Office of the Attorney General for the State of Minnesota, entered appearances.

*Sean H. Donahue* argued the cause for petitioners Public Interest Organizations. With him on the briefs were *Matthew Littleton*, *Benjamin Longstreth*, *Irene Gutierrez*, *Joanne Spalding, Alejandra Núñez*, *Vera Pardee*, *Vickie Patton*, *Peter Zalzal*, *Martha Roberts*, *Alice Henderson*, *Erin Murphy*, *Howard I. Fox*, *Javier Guzman*, *Travis Annatoyn*, *Maya Golden-Krasner*, *Scott L. Nelson*, and *Emily K. Green*.

*Howard M. Crystal*, *David D. Doniger*, *Seth L. Johnson*, and *Susannah Weaver* entered appearances.

*Robert A. Wyman*, *Jr.*, *Joel C. Beauvais*, *Devin O'Connor,* and *Kevin Poloncarz* were on the briefs for petitioners National Coalition for Advanced Transportation, et al. *Steven Croley* entered an appearance.

*Michael Burger* was on the brief for *amici curiae* The National League of Cities, et al. in support of petitioners. *Susan E. Amron*, *Edward N. Siskel*, and *Jennifer M. Stacy* entered appearances.

*Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, and *Eric R. Olson*, Solicitor General, were on the brief for *amicus curiae* the State of Colorado in support of petitioners.

*Gary S. Guzy*, *Beth S. Brinkmann*, *Thomas Brugato*, and *Jeffery S. Dennis* were on the brief for *amicus curiae* Advanced Energy Economy in support of petitioners.

*Bayron T. Gilchrist*, *Barbara Baird*, *William B. Wong*, and *Brian Tomasovic* were on the brief for *amicus curiae* South Coast Air Quality Management District in support of petitioners.

*Jared P. Marx* and *Samuel Walsh* were on the brief for *amicus curiae* Lyft, Inc. in support of petitioners.

*Joseph R Palmore* was on the brief for *amicus curiae* Consumers Federation of America in support of petitioners.

*Eric G. Hostetler*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were

*Eric Grant*, Deputy Assistant Attorney General, and *David Orlin* and *Mark Kataoka*, Counsel, U.S. Environmental Protection Agency.

*Erin E. Murphy* argued the cause for intervenors. With her on the brief were *Paul D. Clement*, *Stuart Drake*, *C. Harker Rhodes IV*, *Raymond B. Ludwiszewski*, *John T. Whatley*, *Susan T. Conti*, and *Charles H. Haake.*

Before: ROGERS, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court by Circuit Judge Rogers.

ROGERS, *Circuit Judge*: After the Environmental Protection Agency ("EPA") announced that it would reconsider the appropriateness of, and conduct a rulemaking to potentially alter, greenhouse gas emission standards adopted in 2012 for model year 2022 to 2025 motor vehicles, a coalition of states, environmental groups, and industry representatives brought this challenge. Because we conclude EPA has not engaged in "final action" under the Clean Air Act, the petitions for review are dismissed for lack of jurisdiction.

## I.

Section 202(a) of the Clean Air Act ("CAA") directs EPA to "prescribe (and from time to time revise)" standards for "the emission of any air pollutant from . . . new motor vehicles or new motor vehicle engines," which "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a). One group of regulated air pollutants are greenhouse gases ("GHGs"), which EPA has found may reasonably be anticipated to endanger public health and welfare based on their contribution to climate

change. Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,516 (Dec. 15, 2009). The CAA generally prohibits states from adopting their own vehicle emissions standards. *See* 42 U.S.C. § 7543(a). Congress, however, allowed the EPA Administrator to grant waivers to states that had adopted standards prior to 1966 so long as their standards were "at least as protective of public health and welfare" as the federal ones. *Id.* § 7543(b). California was the only state that qualified for this waiver of federal preemption, *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1296 (D.C. Cir. 1979), until Congress added Section 177 to the CAA in 1977 to permit other states to "adopt and enforce" standards that are identical to those of California, 42 U.S.C. § 7507. Congress required California, along with any state that adopted California's standards under Section 177, to give auto manufacturers "a two-year lead time" to comply. *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 196 (D.C. Cir. 2011) (citing 42 U.S.C. § 7507).

The Energy Policy and Conservation Act (as amended by the Energy Independence and Security Act) requires the Secretary of Transportation to prescribe by regulation corporate average fuel economy ("CAFE") standards for new vehicles. 49 U.S.C. § 32902(a). CAFE standards are to be set "for at least 1, but not more than 5, model years" at a time. *Id.* § 32902(b)(3)(B). The Secretary has delegated this rulemaking authority to the National Highway Traffic Safety Administration ("NHTSA"). 49 C.F.R. § 1.95(a).

In view of "[t]he close relationship between emissions of $CO_2$ — the most prevalent greenhouse gas emitted by motor vehicles — and fuel consumption, [which] means that the technologies to control $CO_2$ emissions and to improve fuel economy overlap to a great degree," EPA and NHTSA

announced in 2009 that they would collaborate to propose harmonized standards under their respective statutory authorities. *See* Notice of Upcoming Joint Rulemaking to Establish Vehicle GHG Emissions and CAFE Standards, 74 Fed. Reg. 24,007, 24,008, 24,009 n.7 (May 22, 2009). The following year, the two agencies published a joint final rule establishing "strong and coordinated" GHG emission and CAFE standards, increasing in stringency annually from model year 2012 to 2016. *See* Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards; Final Rule, 75 Fed. Reg. 25,324, 25,326, 25,330 (May 7, 2010). This new "National Program" represented "an agreement between the federal government, California, and the major automobile manufacturers" that would enable "manufacturers to sell a 'single light-duty national fleet' that satisfie[d] the standards of the EPA, NHTSA, California, and the Section 177 states." *Chamber of Commerce of U.S.*, 642 F.3d at 198 (quoting 75 Fed. Reg. at 25,324). To that end, the California Air Resources Board ("CARB") agreed to amend its regulations to deem an automaker's compliance with the National Program as compliance with its (previously more-stringent) standards. *See* 75 Fed. Reg. at 25,327–29.

As a continuation of the National Program, in 2012 EPA and NHTSA published GHG emission and fuel economy standards for 2017 to 2025 model year ("MY") vehicles. *See* 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 62,624, 62,638 (Oct. 15, 2012). Because NHTSA was statutorily limited to promulgating standards for a maximum of five model years, it issued CAFE standards for model years 2017 to 2021 and announced "augural" standards for model years 2022 to 2025 based on its "current best judgment of what [it] would have set at this time had [it] the authority to do so." 77 Fed. Reg. at 62,629 n.8. The

agencies estimated that this nine-year phase of the National Program would save four billion barrels of oil, reduce GHG emissions by two billion metric tons, and generate net lifetime fuel savings of $3,400 to $5,000 per vehicle sold. *Id.* at 62,627. California "reconfirmed its commitment" to deem compliance with the federal standards as compliance with its standards, so long as the proposed reductions "are maintained." *Id.* at 62,637–38.

In light of the National Program's "long time frame" and NHTSA's need to conduct a further rulemaking to finalize the augural standards, the agencies also committed in 2012 to conduct a "comprehensive mid-term evaluation," which would include public notice and comment. *See id.* at 62,784. The agencies stated that they "fully expect to conduct the mid-term evaluation in close coordination with" CARB and that "any adjustments to the standards" will "ensure[] continued harmonization of state and Federal vehicle standards." *Id.* EPA issued regulations requiring it to make a final decision by April 1, 2018, on whether the model year 2022 to 2025 standards remained "appropriate" under Section 202(a) of the CAA based on "the record then before the Administrator." 40 C.F.R. § 86.1818–12(h) ("Section 12(h)"). The Section 12(h) regulations required EPA's appropriateness determination to be "based upon a record" that included "a draft Technical Assessment Report" issued by November 15, 2017; "public comment on the draft Technical Assessment Report"; "public comment on whether the standards . . . are appropriate under section 202(a)"; and "such other materials the Administrator deems appropriate." *Id.* §§ 86.1818–12(h)(2), (3). The Administrator's decision-making process was "intended to be as robust and comprehensive as that in the original setting of the MY2017–2025 standards." 77 Fed. Reg. at 62,784. To that end, the Section 12(h) regulations required EPA to "consider

the information available on the factors relevant to setting greenhouse gas emission standards," including:

> (i) The availability and effectiveness of technology, and the appropriate lead time for introduction of technology;
> (ii) The cost on the producers or purchasers of new motor vehicles or new motor vehicle engines;
> (iii) The feasibility and practicability of the standards;
> (iv) The impact of the standards on reduction of emissions, oil conservation, energy security, and fuel savings by consumers;
> (v) The impact of the standards on the automobile industry;
> (vi) The impacts of the standards on automobile safety;
> (vii) The impact of the greenhouse gas emission standards on the Corporate Average Fuel Economy standards and a national harmonized program; and
> (viii) The impact of the standards on other relevant factors.

*Id.* § 86.1818–12(h)(1).  EPA's evaluation was to be "holistic . . . without placing decisive weight on any particular factor or projection."  77 Fed. Reg. at 62,784.

If, at the end of the mid-term evaluation, EPA concluded that the 2012 standards remained appropriate under Section 202(a), that determination would be "final agency action . . . subject to judicial review on its merits."  *Id.*  On the other hand, "[i]f the Administrator determines [the model year 2022 to 2025 standards] are not appropriate, the Administrator shall initiate a rulemaking to revise the standards, to be either more or less stringent as appropriate."  40 C.F.R. § 86.1818–12(h).  That rulemaking would be conducted jointly with NHTSA, and

10

"[a]ny final action taken by EPA at the end of that rulemaking [would also be] judicially reviewable." 77 Fed. Reg. at 62,785. Regardless of the outcome of the mid-term evaluation, EPA's "MY2022–2025 GHG standards will remain in effect unless and until EPA changes them by rulemaking." *Id.*

**A.**

**Original Determination.** EPA, NHTSA, and CARB began research and outreach to stakeholders shortly after the 2012 final rule was issued, and in July 2016, published for public comment a 1,217-page Draft Technical Assessment Report. *See* Notice of Availability of Midterm Evaluation Draft Technical Assessment Report for Model Year 2022–2025 Light Duty Vehicle GHG Emissions and CAFE Standards, 81 Fed. Reg. 49,217, 49,218 (July 27, 2016). The agencies found that "[a] wider range of technologies exist[s] for manufacturers to use to meet the MY 2022–2025 standards, and at costs that are similar or lower, than those projected" when the standards were established in 2012. After receiving over 200,000 public comments on the Draft Technical Assessment Report, EPA published a 268-page Proposed Determination and accompanying 719-page Technical Support Document for further public comment. *See* Proposed Determination on the Appropriateness of the Model Year 2022-2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards Under the Midterm Evaluation, 81 Fed. Reg. 87,927, 87,927–28 (Dec. 6, 2016). EPA concluded that the model year 2022 to 2025 GHG emission standards "remain appropriate under the Clean Air Act and therefore should not be amended to be either more or less stringent." *Id.* at 87,927.

After a period of public comments on the Proposed Determination, EPA completed the mid-term evaluation with its January 2017 Original Determination. *See* Final Determination on the Appropriateness of the Model Year

2022–2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation, EPA-420-R-17-001 (2017) ("Original Determination"). The Administrator concluded that the "standards adopted in 2012 by the EPA remain feasible, practical and appropriate under Section 202(a) and do not need to be revised, after considering the factors laid out in the 2012 rule." *See* Cover Letter to Stakeholders from Gina McCarthy, Administrator, EPA (Jan. 12, 2017), *available at* https://www.epa.gov/sites/production/files/2017-01/documents/mte-stakeholder-letter-2017-01-12.pdf. EPA explained that the cost of emissions-reducing technologies was "less than projected in the 2012 rulemaking," and that "technology adoption rates and the pace of innovation have accelerated even beyond what EPA expected." *See* Original Determination at 13, 23. Therefore, EPA found that "it will be practical and feasible for automakers to meet the MY 2022-2025 standards at reasonable cost." *Id.* at 29. Because the Original Determination left the "standards entirely as they now exist, unaltered," EPA reasoned that its "final order constitutes a final agency action." *Id.* at 1.

## B.

**Revised Determination**. Following the transition in presidential administrations, EPA changed lanes. President Trump announced in Detroit in March 2017 that he was "going to cancel" the Original Determination and "going to restore the originally scheduled mid-term review." *See Remarks by President Trump at American Center for Mobility, Detroit, MI*, The White House (Mar. 15, 2017), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-american-center-mobility-detroit-mi/. The following week, EPA formally announced that it would reconsider the Original Determination. *See* Notice of Intention To Reconsider the Final Determination, 82 Fed. Reg. 14,671, 14,671 (Mar. 22, 2017). EPA solicited public comment on the

reconsideration in August, declaring that although it would conduct the reconsideration in accordance with Section 12(h), it was not reopening the Technical Assessment Report for comment. *See* Request for Comment on Reconsideration of the Final Determination, 82 Fed. Reg. 39,551, 39,551–53 (Aug. 21, 2017).

On April 13, 2018, EPA published its Revised Determination "withdrawing" the Original Determination and concluding that the standards were "not appropriate." *See* Mid-Term Evaluation of Greenhouse Gas Emissions Standards for Model Year 2022–2025 Light-Duty Vehicles, 83 Fed. Reg. 16,077, 16,077 (Apr. 13, 2018) ("Revised Determination"). Because the Administrator now thought that the "current standards may be too stringent," EPA would embark on a rulemaking to revise the standards "as appropriate." *Id.* EPA explained that it had developed a "significant record" since the Original Determination and that this record suggested that "[m]any of the key assumptions EPA relied upon . . . were optimistic or have significantly changed." *Id.* at 16,078. Consequently, EPA would, "in partnership with NHTSA, [] initiate a notice and comment rulemaking . . . to further consider appropriate standards for MY 2022–2025 light-duty vehicles." *Id.* at 16,087. EPA reiterated that the "current standards remain in effect" and stated that the Revised Determination was "not a final agency action." *Id.*

Although EPA concluded that the 2012 standards were "not appropriate," its analysis of the individual Section 12(h) factors was less definitive. For example, with respect to the availability and effectiveness of technology factor, EPA had found in the 2017 Original Determination that there would "be multiple technologies available at reasonable cost to allow the industry to meet the MY2022–2025 standards." *See* Original Determination at 18. EPA's analysis had shown that

automakers would be able to meet the standards largely through use of advanced gasoline technologies, with only low numbers of strong hybrids and electric vehicles needed. *Id.* By contrast, in the 2018 Revised Determination, EPA found that there was "greater uncertainty as to whether technology will be available to meet the standards" based on changes, such as "flagging" consumer demand for electric vehicles and uncertainty about the availability of technological advances. *See* 83 Fed. Reg. at 16,079. With respect to the cost factor, EPA had initially found that buyers would see a payback from reduced fuel expenditures and realize vehicle-lifetime net savings of $1,650. *See* Original Determination at 20–21. But in the Revised Determination, EPA found that its prior analysis had "not give[n] appropriate consideration to the effect on low-income consumers" and thus "affordability concerns and their impact on new vehicle sales should be more thoroughly assessed." 83 Fed. Reg. at 16,084. As a final example, EPA had concluded in the Original Determination that regulatory certainty was an "important consideration" because it would help automakers engage in long-term product planning, technology development, and investing. Original Determination at 28. EPA reversed itself in the Revised Determination, stating that it was "reconsidering its conclusion that maintaining the current standards is the best way to provide [regulatory] certainty." 83 Fed. Reg. at 16,087.

Since publishing the Revised Determination, EPA and NHTSA have issued a proposed rule setting GHG emission and fuel economy standards for the 2021 to 2026 model years at the same levels as were applicable for the 2020 model year. *See* The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 83 Fed. Reg. 42,986, 42,988 (Aug. 24, 2018). Comments on the proposed rule were due by October 2018. *See id.* at 42,986. On September 27, 2019, EPA and NHTSA also formally

announced the withdrawal of state authority to adopt and enforce state standards but otherwise left in place for now the 2012 standards. The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310, 51,350–52 (Sept. 27, 2019).

## II.

After EPA issued the Revised Determination, State Petitioners, Environmental Group Petitioners, and Electric Industry Petitioners timely filed for review pursuant to 42 U.S.C. § 7607(b)(1).[1] Petitioners contend that EPA violated the procedural and substantive requirements imposed by Section 12(h) and that the Revised Determination was arbitrary and capricious under the Administrative Procedure Act. They seek vacatur of the Revised Determination. Respondents EPA and its Administrator, Andrew Wheeler, and Intervenors the Association of Global Automakers, Inc., and the Alliance of

---

[1] The State Petitioners are the States of California (by and through its Governor Edmund G. Brown Jr., Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Iowa, Maine, Maryland, Minnesota (by and through its Minnesota Pollution Control Agency and Minnesota Department of Transportation), New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington; the Commonwealths of Massachusetts, Pennsylvania (by and through its Department of Environmental Protection and Attorney General Josh Shapiro), and Virginia; and the District of Columbia. The Environmental Group Petitioners are the Center for Biological Diversity; Conservation Law Foundation; Environmental Defense Fund; Natural Resources Defense Council; Public Citizen, Inc.; Sierra Club; and the Union of Concerned Scientists. The Electric Industry Petitioners are the National Coalition for Advanced Transportation; Consolidated Edison Company of New York, Inc.; National Grid USA; New York Power Authority; and the City of Seattle (by and through its City Light Department).

Automobile Manufacturers moved to dismiss the petitions for lack of jurisdiction on the ground that the Revised Determination was not "final action" under 42 U.S.C. § 7607(b)(1).

Only "final action" under the Clean Air Act is judicially reviewable. 42 U.S.C. § 7607(b)(1). The "term 'final action' is synonymous with the term 'final agency action' as used in Section 704 of the APA." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004). If an action is not final, this court "lack[s] jurisdiction to hear an administrative challenge." *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017).

Agency action is final only if "two independent conditions are met." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018). "First, the action must mark the consummation of the agency's decisionmaking process"; in other words, "it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation omitted). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotations omitted). Because Petitioners' contention that the Revised Determination is judicially reviewable final action by EPA fails at the *Bennett* test's second prong, there is no need to address the test's first prong.

The second prong of the *Bennett* test, as noted, requires the court to decide whether the Revised Determination is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (internal quotations omitted). This inquiry is a "pragmatic" one. *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016) (internal quotation omitted).

The Revised Determination does not determine rights or obligations or establish legal consequences within the meaning of the *Bennett* test's second prong. The Revised Determination did not itself effect any change in the emissions standards that were established by the 2012 final rule for model year 2022–2025 vehicles. EPA has made clear that those "standards will remain in effect unless and until EPA changes them by rulemaking." 77 Fed. Reg. at 62,785. Rather, the Revised Determination created only the *possibility* that there may be a change in the future to the model year 2022–2025 standards as the result of the rulemaking process it initiated. EPA concluded in the Revised Determination that the model year 2022–2025 GHG emission standards are "not appropriate" because they "*may* be too stringent." *See* 83 Fed. Reg. at 16,077 (emphasis added). That reassessment set in motion a rulemaking "to further consider appropriate standards for MY 2022–2025 light-duty vehicles." *Id.* But, again, EPA's Revised Determination itself did not alter the standards in place for those model years. *See id.* at 16,087.

Nor did EPA explain exactly how the 2012 standards would be modified to make them appropriate under Section 12(h). Although the Revised Determination stated that the standards currently in place "may be too stringent," counsel for State Petitioners acknowledged during oral argument that EPA's finding did not bind EPA to relax the standards so long as EPA complies with ordinary notice-and-comment requirements. Oral Arg. 9:53–11:10. Likewise, EPA has taken the position that the Revised Determination "does not dictate the outcome of further rulemaking," Respondents' Br. at 32, and that "all of the options are on the table" in the rulemaking, Oral Arg. at 43:09–25.

In that sense, the Revised Determination is akin to an agency's grant of a petition for reconsideration of a rule. When

an agency grants reconsideration, it creates the possibility (but not the certainty) of an adjustment in the underlying rule, depending on the result of the ensuing proceedings. "By itself, EPA's decision to grant reconsideration, which merely begins a process that could culminate in no change to [a] rule," is not reviewable final agency action. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017). Like granting reconsideration, publishing the Revised Determination evinced EPA's intention to begin the rulemaking process to potentially alter the 2012 standards for model year 2022–2025 vehicles. And, as noted, EPA and counsel for State Petitioners agreed that the process could (at least theoretically) culminate in no change to the current standards.

By withdrawing the Original Determination and initiating a rulemaking, EPA has not erased the Draft Technical Assessment Report, Technical Support Document, or any of the other prior evidence it collected. Rather, EPA has simply announced its intention to revisit the information collected in those earlier proceedings, along with new information gathered since then, to devise the standards that it finds appropriate. *See* 83 Fed. Reg. at 16,078–79. As counsel for EPA acknowledged during oral argument, EPA had not "withdrawn its prior technical analyses or the record" or the Original Determination "in a final way" and thus the withdrawal would neither eliminate any part of the existing administrative record nor affect the standard for judicial review of any future final action. *See* Oral Arg. at 46:06–12, 47:30–48:52. Of course, if EPA ultimately changes the 2012 standards, it will need to provide a "reasoned explanation" for why it is "disregarding facts and circumstances that underlay or were engendered by the" 2022–2025 model year standards when they were set in 2012 and the additional record developed during the original mid-term evaluation process. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see*

*also Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110–11 (D.C. Cir. 2019). As Environmental Group Petitioners point out, the baseline from which EPA must justify any departure from the existing standards remains unchanged by the Revised Determination. *See* Envtl. Grp. Reply Br. at 4–5.

Petitioners advance three additional arguments why the Revised Determination satisfied *Bennett's* second prong. First, Petitioners argue that the Revised Determination "created direct legal consequences for the agency" because it required EPA to conduct a rulemaking to revise the emission standards. Second, Petitioners argue that the Revised Determination created legal consequences for the states, particularly those that must initiate their own rulemaking processes to ensure continued compliance with California's GHG emission standards. And third, Petitioners argue that the Revised Determination is final action because it withdrew the 2017 Original Determination, which itself was final action. These arguments are unavailing.

The Revised Determination did not create the type of legal consequences for EPA that entail final action. As Respondents point out, when the court spoke of "binding effects" or "legal consequences" in two cases on which Petitioners rely, it meant something different from what Petitioners suggest. In *Center for Auto Safety v. NHTSA*, NHTSA had sent letters to automakers noting its "concerns" about the practice of regional recalls of defective vehicles and establishing guidelines for recalls of limited geographic scope. *See* 452 F.3d 798, 802–04 (D.C. Cir. 2006). The court held that these letters were mere general statements of policy, rather than final agency action, because, in part, NHTSA officials were not compelled to apply the guidelines in subsequent enforcement actions. *Id.* at 809. And in *National Environmental Development Association's Clean Air Project v. EPA*, EPA had, in response to a decision

by the Sixth Circuit unfavorable to the agency, written a directive explaining how it would make source determinations in Clean Air Act Title V permitting decisions differently depending on whether the source was within the jurisdiction of the Sixth Circuit. *See* 752 F.3d 999, 1002–03 (D.C. Cir. 2014). The court held that EPA's directive was final action because it "provides firm guidance to enforcement officials about how to handle permitting decisions." *Id.* at 1007. Indeed, its "finality and legal consequences . . . were made plain when the EPA relied on the directive in a permit decision involving a company located outside the jurisdiction of the Sixth Circuit." *Id.* Thus, in the two cases State Petitioners cite, the issue was whether the agency's action created enforceable rules for regulated parties in future proceedings. EPA, here, has not bound itself to any changed enforcement approach. Therefore, these cases lend no support to Petitioners' view that EPA engaged in final action by creating a legal obligation for it to conduct a rulemaking.

Nor was the Revised Determination an action "from which legal consequences will flow," *Bennett*, 520 U.S. at 178, for the Petitioner States. The court here primarily looks to "the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). The court has also taken stock of the "practical burden[s]" of agency action, *CSI Aviation Services, Inc. v. U.S. Department of Transportation*, 637 F.3d 408, 412 (D.C. Cir. 2011), particularly when the "writing is on the wall" about how the agency will act in the future, *Safari Club International v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016). But "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).

State Petitioners contend that the "Revised Determination wiped away EPA's previous assurance that the existing standards would remain legally binding." *See* States' Br. at 31. They point out that Section 177 states and the District of Columbia needed to act quickly—before a final rule was published—in order to put in place California's standards (which would no longer mirror the federal standards) within the required two-year lead time. For example, the State of Washington explained that its legislature enacted California's emission standards and required its Department of Ecology to issue rules to implement those standards, *see* Wash. Rev. Code § 70.120A.010 (2010), but because of the Revised Determination, its Department of Ecology was "required to revise [its] rules to ensure that the California standards for MY 2022–2025 will be applicable in Washington State." *See* States' Add. 151.

Still, the Revised Determination did not have any actual legal effect on the Section 177 states. Although the Revised Determination declared the current GHG emission standards "not appropriate," it did not change the 2012 standards. To that extent, the Revised Determination did not compel the Petitioner States to act in order to meet their commitments. The Petitioner States and the District of Columbia may have been "prudent" to act quickly based on their prediction that the standards will be made less stringent in the forthcoming final rule, but such voluntary actions do not generate final agency action. *See In re Murray Energy Corp.*, 788 F.3d 330, 335 (D.C. Cir. 2015).

Finally, Petitioners provide no support for their view that the Revised Determination is final action simply because the Determination it withdrew was itself final action. Such symmetry is not required. After all, the two contrary determinations put EPA along different paths: the Original

Determination ended the rulemaking process while the Revised Determination restarted it. Much like on a petition for reconsideration, whether EPA decides to stay the course or consider changing the 2012 standards leads the court to a different conclusion on whether the action is final. *See Clean Air Council*, 862 F.3d at 6. The Original Determination has been withdrawn, but the evidence supporting it stands. If EPA's rulemaking results in changes to the existing 2012 standards, it will be required to provide a reasoned explanation and cannot ignore prior factual findings and the supporting record evidence contradicting the new policy. *See Nat'l Lifeline Ass'n*, 921 F.3d at 1110–11.

Because the Revised Determination neither determines rights or obligations or imposes any legal consequences, nor alters the baseline upon which any departure from the currently effective 2012 emission standards must be explained, the Revised Determination is not judicially reviewable final action, and the petitions for review must be dismissed.